UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

In re

CONSOLIDATED DISTRIBUTORS, INC.,

                  Debtor.

----------------------------------------------------------------x

Chapter 11

Case No. 13-40350 (NHL)


**MEMORANDUM DECISION DENYING MOTION TO DISMISS,
WITHOUT PREJUDICE, AND GRANTING MOTION TO
LIFT THE AUTOMATIC STAY**

*Appearances*:

David M. Hillman, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022

Attorneys for Monster Energy Company

David Carlebach, Esq.
Law Offices of David Carlebach, Esq.
40 Exchange Place
New York, New York 10005

Attorney for the Debtor

**HONORABLE NANCY HERSHEY LORD**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are two motions (the "Motions") brought by Monster Energy Company ("MEC").   First, on February 5, 2013, MEC filed an Emergency Motion for an Order Clarifying That the Automatic Stay Does Not Apply and for Relief From the Automatic Stay Under 11 U.S.C. § 362(d)(1) (the "Lift Stay Motion").[1]   Second, on February 20, 2013, MEC filed a Motion For an Order Dismissing the Debtor's Chapter 11 Case and Alternatively to Either Convert the Debtor's Chapter 11 Case to a Case Under Chapter 7 or to Appoint a Chapter 11 Trustee (the "Motion to Dismiss").[2]   Consolidated Distributors, Inc. (the "Debtor") contested the MEC Motions.

The Court held a preliminary hearing on the Lift Stay Motion on February 14, 2013. Then, after MEC filed the Motion to Dismiss, the Court conducted an evidentiary hearing on the MEC Motions (the "Evidentiary Hearing") on February 27, February 28, March 1, March 4, March 7 and March 14, 2013.   Over the course of six days, the Court heard testimony from David Baksht ("Baksht"), Debtor's principal; Nediva Schwarz ("Schwarz"), Baksht's personal friend and benefactor and an alleged creditor and licensee of the Debtor; and Mark S. Friedlander, Esq. ("Friedlander"), the Debtor's proposed corporate attorney.   Numerous exhibits were admitted into evidence and the Court took judicial notice of several public documents.   At the conclusion of the Evidentiary Hearing, the Court directed the parties to submit post-hearing memoranda of law and proposed findings of fact and conclusions of law.

Based on the entire record, including the testimony, exhibits and arguments of counsel, and for the reasons set forth below, the Court grants the Lift Stay Motion and denies without prejudice the Motion to Dismiss.

---

[1] Docket Entry 10
[2] Docket Entry 24

## **Jurisdiction**

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(1) and the Eastern District of New York standing order of reference dated August 28, 1986, as amended by order dated December 5, 2012.   This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G). Venue in this district is proper pursuant to 28 U.S.C. § 1409.   The following are the Court's findings of fact and conclusions of law to the extent required by Rule 52 of the Federal Rules of Civil Procedure, as made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## **Background**

### *The District Court Action*

On March 3, 2011, MEC commenced a lawsuit (the "District Court Action") in the United States District Court for the Middle District of Florida (the "District Court") against multiple defendants including the Debtor, Baksht and Joe Cool, Inc. ("Joe Cool").   In the District Court Action, MEC alleged that the Debtor and Baksht infringed MEC's "M-Claw" trademark by marketing and assisting others in marketing clothing bearing the so-called "3DL" trademark.   The District Court Action proceeded as to Joe Cool, an alleged joint venturer of the Debtor and resulted in a settlement.

The Debtor and Baksht, however, did not appear in the District Court Action until a year after the complaint was filed.   After the District Court entered a default, the Debtor sought relief from the default and filed an answer and counterclaims against MEC.   The Debtor alleged that its use of the "3DL" trademark pre-dated MEC's use of the "M-Claw" trademark and, thus, MEC was infringing on Debtor's trademark rights.   Furthermore, Debtor counterclaimed that the seizure by MEC of goods bearing the so-called "3DL" trademark at Joe Cool's Florida place of business constituted a "wrongful seizure" within the meaning of federal trademark law, entitling the Debtor

to damages.   Joe Cool had released all such claims as part of its settlement with MEC.

MEC and the Debtor engaged in discovery, including the depositions of eleven witnesses and the production of tens of thousands of pages of documents.   When discovery closed in September 2012, both parties filed motions for summary judgment.   The District Court granted in part and denied in part MEC's motion and denied the Debtor's motion in its entirety.   On December 17, 2012, the parties filed a seventy page "Joint Pretrial Statement."   The parties planned to call twenty-two witnesses and designated twenty-eight additional witnesses.   The District Court scheduled a jury trial for February 2013.

On January 13, 2013, the District Court entered an order dismissing the Debtor's counterclaims against MEC without prejudice on the basis that the Debtor did not have any officers or directors at the time the counterclaims were filed and, thus, no person had authority to retain counsel on behalf of the Debtor or authorize the filing of those counterclaims.   Then, after learning that the Debtor filed a chapter 11 bankruptcy petition on January 22, 2013, the District Court invited the parties to submit briefs addressing the implication of the automatic stay on the District Court Action.   In light of the bankruptcy filing, the District Court stayed MEC's claims against the Debtor, but concluded that the automatic stay did not apply to the District Court Action with respect to MEC's claims against Baksht and the Debtor's counterclaims against MEC.

The District Court set a February 21, 2013 trial date for MEC's claims against Baksht. However, on February 15, 2013, the District Court, *sua sponte*, stayed the entire District Court Action pending the resolution of the Debtor's bankruptcy case, because the District Court believed that a jury could not possibly resolve the issues surrounding Baksht's liability without addressing the Debtor's liability.

***The Debtor's Bankruptcy Case***

On January 22, 2013, the Debtor commenced a voluntary chapter 11 bankruptcy case. Noson A. Kopel, Esq., Debtor's then proposed counsel, filed the petition on Debtor's behalf. David Carlebach, Esq. has since replaced Mr. Kopel as Debtor's counsel.[3]

In its Statement Pursuant to Local Bankruptcy Rule 1007-4 (the "LBR 1007-4 Affirmation"), filed on the petition date, the Debtor, by Baksht, disclosed that it is a defendant and a counterclaim plaintiff in the District Court Action and that the Debtor was experiencing difficulty defending this case due to insufficient cash funds.    Likewise, Baksht testified that the "primary reason" motivating this bankruptcy filing was to automatically stay the District Court Action, because Baksht needed relief from the demands of litigation and time to focus on his business.[4]

Subsequent to the bankruptcy filing, the Debtor made two requests for extensions of time to file schedules and the statement of financial affairs required by section 1116(3) of the Bankruptcy Code and Bankruptcy Rule 1007.   The Court granted both requests and required the Debtor to make its filings by February 21, 2013.   However, Debtor did not meet that deadline and did not seek a further extension.   Debtor did not file its schedules and statement of financial affairs until March 14, 2013, after the Evidentiary Hearing closed.

---

[3] Mr. Carlebach filed an "Application to Employ The Law Offices of David Carlebah, Esq., Attorneys to the Debtor" on February 26, 2013.   Docket Entry 34.   However, Mr. Carlebach's retention has not yet been approved by order of the Court, because an order in conformity with Local Rule 2014-1 has not been uploaded.

[4] 3/4/13 Tr. at 150:21-151:2

*The Debtor's Financial Picture*

The Debtor is a New York corporation, formed in 2008, in the business of owning and licensing intellectual property.   The Debtor operates out of Baksht's apartment.   Baksht contends that he owns 100% of the Debtor's equity and is the sole director.[5]

The Debtor has no cash and has never retained an accountant, held a line of credit from a financial institution, or filed tax returns.[6]   Furthermore, the Debtor never maintained a bank account, which Baksht explained was because any income due to the Debtor was being held by Joe Cool.   According to Baksht, Joe Cool was unable to forward those funds to the Debtor because of the financial difficulties that befell Joe Cool as a result of MEC's alleged wrongful seizure of merchandise.[7]   Baksht testified, however, that he did plan to open a bank account and retain an accountant for the Debtor.[8]

Baksht stated that the Debtor obtained credit from various businesses and individuals within his religious community.[9]   The Debtor borrowed money from Schwarz to pay the chapter 11 filing fee and to pay retainers for its bankruptcy counsel.[10]   Presently, the Debtor is unable to pay its postpetition administrative expenses.[11]   Nevertheless, Baksht expressed confidence that Schwarz will loan the Debtor money to pay those expenses.[12]

Inasmuch as the Debtor's Schedules were not filed until after the close of evidence in these contested matters, for the purposes of MEC's Motions, the Debtor's assets and liabilities are

---

[5] 2/27/13 Tr. at 10:6-10
[6] 2/27/13 Tr. at 14:1-15:7
[7] 2/27/13 Tr. at 14:21-15:2.   The "wrongful" seizure of merchandise occurred in March 2011.   The merchandise was seized from, and subsequently returned to, Joe Cool.
[8] 3/4/13 Tr. at 106:2-7, 168:20-169
[9] 2/27/13 Tr. at 14:20-21
[10] 2/27/13 Tr. at 28:7-11, 51:15-53:5
[11] 2/27/13 Tr. at 23:4-14, 26:7-14; 3/4/13 Tr. at 165:20-21
[12] 2/27/13 Tr. at 26:20-27:4

ascertained from the LBR 1007-4 Affirmation, pleadings, testimony, exhibits admitted into evidence and public records of which the Court took judicial notice.

### The Debtor's Assets

The Debtor's petition estimated its assets as between $0 and $50,000.[13]   However, Baksht testified that the petition was prepared "in haste" and that the Debtor would amend its petition to indicate that it has "much more" than $50,000 to $100,000 in assets.[14]   The Debtor contends that it has significant assets in trademarks, disputed causes of action and accounts receivable.

*The Trademarks*

First, the Debtor claims as its primary asset the "3DL" trademark, which is the subject of the District Court Action.   The Debtor acquired the mark from Joe Cool in 2010 pursuant to an oral assignment.[15]   The Debtor's registration application for the mark, which was pending in the U.S. Patent and Trademark Office, was suspended subject to resolution of the District Court Action.[16]   As noted above, the Debtor alleged in its District Court Action counterclaim that its use of the "3DL" mark pre-dated MEC's use of the mark and, therefore, MEC infringed the Debtor's trademark rights.   The Debtor seeks substantial damages for the alleged infringement.

Second, the Debtor holds a trademark for the "Daytona Beach Bike Rally."[17]   Baksht testified that Joe Cool generated revenue by producing clothing with the "Daytona Beach Bike

---

[13]  Docket Entry 1

[14]  3/1/13 Tr. at 200:14-201:11

[15]  Baksht testified about the use and enforceability of oral agreements in the Hasidic community.   Baksht explained that there are no writings in the Hasidic community because most agreements are done by trust. 3/1/13 Tr. at 191:22-192:1; 2/27/13 Tr. at 22:5-15

[16]  Movant's Exh. 14; 3/1/13 Tr. at 19:4-9

[17]  Respondent's Ex. 1. The annual Daytona Beach Bike Week event has taken place in Daytona Beach, Florida for the past 70 years.   2/27/13 Tr. at 39:19-22.

Rally" mark.[18]  He explained that, pursuant to an unwritten joint venture agreement between the Debtor and Joe Cool, the funds belonging to the Debtor were deposited into Joe Cool's bank account, to be divided following a yearly accounting.[19]  Baksht stated that the agreement provided that one-half of the $300,000 net profit belonged to the Debtor.[20]  However, the Debtor never received the cash profits to which it was entitled because, when Joe Cool experienced financial distress following the MEC seizure, the Debtor agreed that Joe Cool could "send [the Debtor] the money later."[21]  While Debtor contends that the "Daytona Beach Bike Rally" trademark is worth approximately $1 million,[22] MEC challenges the trademark's viability.[23]

Third, the Debtor holds an exclusive license to use the "Soft N Sleek" trademark.[24]  The Debtor sublicensed the "Soft N Sleek" mark to A1 Distributors pursuant to an oral agreement.[25] A1 Distributors used the mark in connection with the sale of kosher baby wipes.[26]  Baksht testified that neither the Debtor nor A1 Distributors currently uses the "Soft N Sleek" mark, but that A1 Distributors is considering restarting its use of the mark.[27]

The actual owner of the "Soft N Sleek" mark is Soft N Sleek, Inc., a company wholly

---

[18] 2/27/13 Tr. at 69:7-25
[19] 2/28/13 Tr. at 76:18-24
[20] 2/28/13 Tr. at 75:14-23
[21] 2/28/13 Tr. at 79:3-9
[22] Docket Entry 53 (Debtor's Post-Trial Memorandum in Furtherance of its Objection to the Emergency Motion of Monster Energy Company for an Order Dismissing Debtor's Chapter 11 Case and Related Relief ("Debtor's Post Hearing Memo") at ¶ 17).
[23] A default judgment entered against the Debtor in a lawsuit filed in the United States District Court for the Middle District of Florida with respect to the "Daytona Beach Bike Mark" provided, among other things, that the "phrase 'Daytona Beach Bike Week' and its functional equivalents are generic and cannot receive trademark protection."  Movant's Exh. 17 at 8-10.
[24] 2/28/13 Tr. at 23:11-14
[25] 3/1/13 Tr. at 191:15-16
[26] 3/7/13 Tr. at 67:14-21, 71:17-21
[27] 3/13/13 Tr. at 67:14-18; 3/4/13 Tr. at 164:2-4

owned and controlled by Baksht.[28]   Soft N Sleek, Inc. submitted a trademark application, but the

mark has not been registered with the U.S. Patent and Trademark Office because Sleek Sensations

Limited, a company engaged in the same business as A1 Distributors, is opposing the

registration.[29]

*Disputed Causes of Action*

As noted above, the Debtor brought counterclaims against MEC in the District Court

Action, which the District Court dismissed without prejudice.   As the alleged prior user, Debtor

seeks an injunction on further use of the "3DL" trademark by MEC.   The Debtor also demands

approximately $20 million in damages for trademark royalties and alleged illegal corporate

seizure, plus punitive damages.[30]

In addition, the Debtor filed an action in the Supreme Court of the State of New York,

Kings County, against Moshe Mortner, the Debtor's former attorney, and Menachem Schneorson,

Baksht's former business partner.   That lawsuit seeks damages of $594,000 for, among other

things, alleged misappropriation and conversion of $150,000 intended for litigation expenses in

the District Court Action, breach of fiduciary duty and aiding and abetting the breach of fiduciary

duty.[31]

*Accounts Receivable*

Baksht testified that the Debtor has two accounts receivable: $22,000 owed by A1

Distributors pursuant to an oral sublicense agreement for the "Soft N Sleek" trademark[32] and

$300,000 to $400,000 owed by Joe Cool for profits due from a joint venture with the Debtor, based

---

[28] 2/27/13 Tr. at 35:20-25
[29] 3/1/13 Tr. at 66:17-24; 71:17-21
[30] 3/1/13 Tr. at 149:9-12
[31] 2/28/13 Tr. at 95:2-96:1; Movant's Ex. 11
[32] 3/1/13 Tr. at 145:8-10; 191:15-16

8

on an oral agreement, regarding the "3DL" and the "Daytona Beach Bike Rally" trademarks.[33]

### The Debtor's Liabilities

The Debtor's LBR 1007-4 Affirmation stated that the Debtor has only three creditors: MEC, Associated Business Consultants, Inc. d/b/a National Trademarks Center ("National Trademark Center") and Baksht. [34]   MEC holds contingent, disputed claims, subject to the resolution of the District Court Action, of up to $2 million for trademark counterfeiting and up to $150,000 for copyright infringement and for reimbursement of MEC's costs and fees.   Also, Baksht testified that National Trademarks Center, an entity that he wholly owns, holds a claim against the Debtor for approximately $64,000 to $68,000 for consulting work provided to the Debtor and Joe Cool.[35]   Baksht stated that he personally performed the work done for the Debtor by National Trademarks Center and that the hourly billing rate for his services is in the range of $300 to $600 per hour.[36]

Approximately one week after the petition date, the Debtor filed a "Statement of Unsecured Creditors,"[37] which lists Incline Texas, LLC ("Incline Texas") in addition to the three creditors listed in the Debtor's LBR 1007-4 Affirmation.   Baksht explained that Incline Texas, a financing institution that lends funds for litigation expenses, provided $150,000 in funding for the District Court Action.[38]   In the event that the Debtor prevails on its counterclaims against MEC in the District Court Action, Incline Texas will hold a lien on the money Debtor recovers from MEC.[39]   Baksht contests this liability on the grounds that his former business partner, Menachem

---

[33] 2/28/13 Tr. at 79:10-14, 134:19-135:6; 3.1/13 Tr. at 145:3-12
[34]  Docket Entry 1
[35] 2/27/13 Tr. at 47:24 - 48:9
[36]  2/27/13 Tr. at 47:24 - 48:9
[37] Docket Entry 8
[38]  2/28/13 Tr. at 92:12-25
[39] 2/28/13 Tr. at 94:9-12

Schneorson, who entered into the funding agreement, was never authorized to take such action on the Debtor's behalf.[40]

At the Evidentiary Hearing, Baksht identified the following additional creditors, which were not listed in the Debtor's LBR 1007-4 Affirmation or Statement of Unsecured Creditors:

(a)    719 Eastern Parkway LLC, the landlord of the premises in which Baksht resides and the Debtor operates, is allegedly owed $18,000 to $18,400 for past due rent.[41]  No evidence was offered indicating that the Debtor was obligated to pay the rent on Baksht's personal residence.

(b)    Schwarz is allegedly owed $64,000 for food she provided to Baksht five or six times a week for three to four years.[42]  Schwarz testified that an invoice for the food prepared by her food company was given to Baksht and "he told [Schwarz] that . . . he's going to pay me from CDI."[43]

(c)    Yossie Chein, a friend of Basksht, is allegedly owed $3,000 on account of an undocumented loan to the Debtor.   Baksht explained that "rarely do these kind of loans get documented between individuals in [his] religious community."[44]

<u>Discussion</u>

***Debtor's Due Process Arguments***

Debtor's Post Hearing Memo focusses on the Debtor's contention that it has been denied its procedural due process rights with respect to the MEC Motions.   For the reasons detailed below, the Court rejects the Debtor's due process arguments.

---

[40] 2/28 Tr. at 91:5-13
[41] 2/27/13 Tr. at 10:13-15, 48:11-15; 3/7/13 Tr. at 13:16-14:6
[42] 2/27/13 Tr. at 49:11-50:14
[43] 3/7/13 Tr. at 49:17-50:11
[44] 2/27/13 Tr. at 51:2-14

10

First, the Debtor alleges that the MEC Motions should not have been heard on an expedited basis. It should be noted, however, that Debtor was represented by counsel at each and every Court hearing and telephonic hearing held since the inception of this bankruptcy case and the Debtor, by its counsel, participated in all scheduling discussions with the Court. Furthermore, the Court found cause to shorten the deadlines under the circumstances.

Initially, the Court found that MEC showed cause for an expedited hearing on its Lift Stay Motion. Specifically, the trial in the District Court Action as against Basksht was scheduled to commence on February 21, 2013, a date approximately four weeks after the Petition Date. Lifting the stay would allow MEC to try its claims against both the Debtor and Basksht on the February 21, 2013 trial date. Thus, the Court held a preliminary hearing on the Lift Stay motion on February 14, 2013 (the "Preliminary Hearing").

Subsequently, the Debtor argues that the Court denied it due process by shortening the statutory notice period for responding to a motion to dismiss. The Court entertained the Motion to Dismiss on shortened notice because of a potential threshold eligibility issue. Although on February 15, 2013, one day after the Preliminary Hearing, the District Court stayed the entire District Court Action,[45] the various pleadings and documents filed in connection with the Lift Stay

---

[45] The District Court dismissed without prejudice the Debtor's counterclaims against MEC on the basis that the Debtor lacked officers and directors at the time the counterclaims were filed by Debtor's counsel. (Movant's Exh. 20-18). Accordingly, the District Court found that there was no person authorized to retain counsel or approve the filing of counterclaims on behalf of the Debtor. *Id.* However, the Debtor's proposed corporate counsel, Mark Friedlander, Esq., submitted a declaration in support of the Debtor's opposition to MEC's Motion to Dismiss (Docket Entry 31-1). With regard to the corporate governance issue that led to the dismissal without prejudice of the Debtor's counterclaim, Mr. Friedlander stated that "[t]he District Court did not have before it the corporate records that are now before this Court even though Debtor's corporate records were filed in that proceeding and were readily available to the Court. . ." Mr. Friedlander explained that the Chief Judge in the District Court Action was not aware of the corporate papers that were made a part of the record and dismissed the Debtor's counterclaims without prejudice. Furthermore, he stated that had the District Court considered these documents, it is likely that MEC's motion to strike would not have been granted as the documents demonstrate viable corporate existence.

11

Motion likewise demonstrated the existence of a disputed issue as to whether Baksht had authority to file this bankruptcy case.   Thus, at the Preliminary Hearing, counsel for MEC made an oral motion to dismiss based on, among other things, the District Court's finding that this Debtor lacked the capacity to retain attorneys and, therefore, did not have the capacity to file this bankruptcy case.   The Court scheduled briefing deadlines on the issues and a hearing on dates agreed to by the parties.

Second, the Debtor argues that it was denied due process because the onslaught of litigation by MEC infringed upon its statutory exclusivity period within which to file a plan.[46]   No provision of the Bankruptcy Code or Bankruptcy Rules immunizes a debtor from a motion to dismiss or a motion for stay relief during the exclusivity period.   Moreover, Debtor's exclusivity period was not due to expire until July 22, 2013.   Accordingly, Debtor's contention that its exclusivity was infringed upon by having to appear and defend the MEC Motions is disingenuous.

Third, the Debtor complains that, at closing argument, it was not permitted to introduce the testimony of an individual purportedly willing to fund the Debtor, as evidence of Debtor's ability to reorganize, in support of its opposition to the Motion to Dismiss.   The introduction of new evidence during closing argument is contrary to established rules of trial procedure.   Closing argument is limited to the facts in evidence – it is not the proper time to introduce facts not already admitted into evidence.   *United States v. Waldemer*, 50 F.3d 1379, 1383 (7th Cir. 1995); *Whittenburg v. Werner Enters. Inc.*, 561 F.3d 1122, 1128-29 (10th Cir. 2009) ("[T]he cardinal rule of closing argument [is] that counsel must confine comments to evidence in the record and to reasonable inferences from that evidence."); *Harnden v. D. Key*, 2009 WL 57637 (E.D. Cal. Jan. 9,

---

*See* Declaration of Mark S. Friedlander in Support of Debtor's Opposition to Motion to Dismiss at ¶ 4.
[46] S*ee* Debtor's Post Hearing Memo at ¶ 2

2009) (noting the impropriety of introducing new evidence in closing arguments).    Here, the

Debtor did not seek to reopen the evidentiary record to introduce any new evidence.    Therefore, in

accordance with well-established rules of trial practice, the Debtor was properly denied the

opportunity to introduce new evidence during closing argument.

In sum, the Court finds that none of the Debtor's claims for violation of its due process

rights are well-grounded.    The Court now turns to the MEC Motions.

***MEC's Motion to Dismiss***

Section 1112(b) of the Bankruptcy Code provides that "on request of a party in interest,

and after notice and a hearing, the court shall convert a case under [chapter 11] to a case under

chapter 7 or dismiss [it], whichever is in the best interests of creditors and the estate," if the movant

establishes cause.    In evaluating a motion made under section 1112(b), the movant has the burden

of demonstrating cause by a preponderance of the evidence.    *In re GEL, LLC*, No.

12-41911-CEC, 2012 WL 3073069 (Bankr. E.D.N.Y. July 30, 2012) (citing *Taub v. Taub (In re

Taub)*, 427 B.R. 208, 231 (Bankr. E.D.N.Y. 2010)).    In analyzing a motion to dismiss, "a

bankruptcy court has wide discretion to determine whether cause exists and, if cause is present, to

decide whether to convert the case to one under Chapter 7 or to dismiss."    *Id.* (citing *In re BH S &

B Holdings, LLC*, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010)).

Section 1112(b)(4) identifies examples of cause.    However, the statutory list is

non-exhaustive and courts have recognized an implicit requirement that a chapter 11 case be filed

in good faith.    *See In re Gen. Growth Props., Inc*., 409 B.R. 43, 56 (Bankr. S.D.N.Y. 2009).    In

the Second Circuit, grounds for dismissal exist if it is clear that, on the filing date, "there was no

reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it

would eventually emerge from bankruptcy proceedings."    *C-TC 9th Ave. P'ship v. Norton Co. (In*

13

*re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1309-10 (2d Cir. 1997) (quoting *Baker v. Latham*

*Sparrowbush Assocs. (In re Cohoes Indus. Terminal, Inc.)*, 931 F.2d 222, 227 (2d Cir. 1991)); *see*

*also In re Kingston Square Assocs.*, 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997) ("a bankruptcy

petition will be dismissed if both objective futility of the reorganization and subjective bad faith in

filing the petition are found").

In *C-TC 9th Ave. P'ship*, the Second Circuit outlined the following factors as indicative of

a bad faith filing that would rise to cause for dismissal:

> (1) the debtor has only one asset;
> (2) the debtor has few unsecured creditors whose claims are small in relation to
> those of the secured creditors;
> (3) the debtor's one asset is the subject of a foreclosure action as a result of
> arrearages or default on the debt;
> (4) the debtor's financial condition is, in essence, a two party dispute between the
> debtor and secured creditors which can be resolved in the pending state foreclosure
> action;
> (5) the timing of the debtor's filing evidences an intent to delay or frustrate the
> legitimate efforts of the debtor's secured creditors to enforce their rights;
> (6) the debtor has little or no cash flow;
> (7) the debtor can't meet current expenses including the payment of personal
> property and real estate taxes; and
> (8) the debtor has no employees.

*In re C-TC 9th Ave. P'ship*, 113 F.3d. at 1311.

In applying the *C-TC* factors, the Court will not "engage in a mechanical counting

exercise" to determine whether the Debtor filed this bankruptcy case in bad faith.   *See In re*

*Century/ML Cable Venture,* 294 B.R. 9, 34 (Bankr. S.D.N.Y. 2003).   These factors are to be

considered in the context of the totality of the circumstances and not in a vacuum.   *In re R&G*

*Properties, Inc.,* 2009 WL 1076703, at *3 (Bankr. D. Vt. April 16, 2009).   No one factor is

determinative of good faith and, "[i]t is the totality of circumstances, rather than any single factor,

that will determine whether good faith exists."   *In re Kingston Square Assocs.*, 214 B.R. at 725;

*see also In re C-TC 9th Ave. P'ship,* 113 F.3d at 1312 (indicating that a finding of bad faith "requires a full examination of all the circumstances of the case" and is "a highly factual determination").[48]

As noted by the court in *In re R&G Properties, Inc.*, 2009 WL 1076703 at *2, "[t]he majority of the *C-TC* factors are 'objective,' in that they can be gauged by objective facts. . . . [The] fifth factor, touches on subjective intent – the debtor's 'intent.'"   Once the movant has established both subjective bad faith and objective futility, "a rebuttable presumption of bad faith arises and the burden shifts to the debtor to 'establish good and sufficient reasons why the relief should not be granted.'"   *Squires Motel, LLC v. Gance (In re Squires Motel, LLC)*, 426 B.R. 29, 34 (N.D.N.Y. 2010) (quoting *In re Yukon Enters., Inc.*, 39 B.R. 919, 921 (Bankr. C.D. Cal. 1984)).

MEC contends that bad faith is shown here for a litany of reasons: the primary reason for this filing was to stay the District Court Action; the filing occurred on the eve of trial; the Debtor lacks cash flow; the Debtor is unable to meet its current expenses; the Debtor lacks employees; the Debtor has few creditors; and the Debtor's primary asset (its alleged interest in the 3DL trademark) is the subject of the District Court Action.

---

[48] Many courts have held that dismissal on bad faith grounds should be granted sparingly.   *See In re G.S. Distrib., Inc.,* 331 B.R. 553, 556 (Bankr. S.D.N.Y 2005); *In re Century ML/Cable Venture,* 294 B.R. 9, 34 (Bankr. S.D.N.Y. 2003); *In re Sletteland,* 260 B.R. 657, 662, n. 2 (Bankr. S.D.N.Y. 2001); *In re Johns-Manville Corp.*, 36 B.R. 727, 737 (Bankr. S.D.N.Y. 1984) (dismissal on bad faith grounds should be granted sparingly and on a clear showing of abuse of the bankruptcy process, avoiding an "intense focus on the debtor's motives in filing").

MEC is correct that multiple *C-TC* factors are substantiated on the record: the Debtor's primary asset is the subject of the District Court Action (factor 3); the Debtor has no cash flow (factor 6); the Debtor cannot meet its current expenses (factor 7); and the Debtor has no employees (factor 8).

However, other *C-TC* factors are not entirely borne out on the record.   For instance, Schwarz has committed to fund the Debtor's expenses up to $200,000, which is relevant as to factor 7.   Moreover, as discussed above, the record shows that the Debtor has more than one asset including accounts receivable and disputed causes of action (factor 1) and several unsecured creditors (factor 2).   And, while Debtor's financial condition is largely, if not totally, dependent on a two-party dispute between the Debtor and MEC with respect to the 3DL trademarks (factor 4), "Chapter 11 filings arising out of a two-party dispute or triggered by state court proceedings do not *per se* constitute bad faith filings."   *In re Walden Ridge Dev. LLC*, 292 B.R. 58, 62 (Bankr. D. N.J. 2003).

With regard to *C-TC* factor 5, "[t]he subjective bad faith standard is meant to insure that the Debtor actually intends to use chapter 11 to reorganize and rehabilitate itself and not simply to cause hardship or delay to its creditors by invoking the automatic stay."   *In re RCM Global Long Term Capital Appreciation Fund, LTD,* 200 B.R. 514, 522 (Bankr. S.D.N.Y. 1996).   The Debtor's intention is looked at as of the time of the bankruptcy filing and "the frustration of creditor remedies alone is insufficient to establish an absence of intent to rehabilitate."   *Id*. (citing *In re Cohoes*, 931. F.2d at 227).

Based upon the Debtor's poor financial condition resulting in its inability to defend itself in the District Court Action, the Debtor could have abandoned its defense in the District Court Action as well as its prosecution of its counterclaims, which might become a valuable asset.

16

Alternatively, the Debtor could file for bankruptcy protection to afford itself "breathing room from [its] creditors" and an opportunity to raise funds to complete the District Court Action. *In re Cohoes,* 931 F.2d at 228. The Court finds that the Debtor did not act in bad faith in choosing the latter.

MEC argues that a finding of cause is still warranted because no reorganizational purpose can be achieved, as there is no legitimate business to rehabilitate. MEC contends that the Debtor's proposed business plan – to raise money in this chapter 11 case with fees it expects to generate from undocumented licenses with Schwarz – is untenable. Although *C-TC* did not list the Debtor's inability to reorganize as a factor indicative of bad faith, it was considered by the court in *In re HBA East, Inc*., 87 B.R. 248, 259 (Bankr. E.D.N.Y. 1988). Case law cautions, however, that "a court should reach the conclusion that there is no demonstrable ability to reorganize only upon the strongest evidentiary showing." *In re RCM Global Long Term Capital Appreciation Fund, LTD,* 200 B.R. at 520. Thus, while in some circumstances a debtor's inability to reorganize might be an indicium of cause, "[t]here is no requirement in the Bankruptcy Code that [the Debtor] prove it can confirm a plan in order to file a petition." *In re Century/ML Cable Venture*, 294 B.R. 9, 35 (Bankr. S.D.N.Y. 2003).

The Debtor contends that it can propose a viable business plan. As stated in its Objection to Motion of Monster Energy Company for an Order Dismissing Debtor's Chapter 11 Case and Related Relief (the "Debtor's Objection to the Motion to Dismiss"),[49] "[the Debtor] owns three valuable trademarks . . . which can be developed into a multi-million dollar business through the earning of royalties through the licensing of those trademarks. The Debtor has commenced

---

[49] Docket Entry 31

identifying potential investors who are willing to back the Debtor in that regard."[50]   The

testimony shows that Schwarz is a purported licensee of the "3DL" mark and the "Daytona Beach

Bike Rally" mark pursuant to "oral licenses" granted by the Debtor.[51]   Schwarz is not currently

producing merchandise with the marks, but she stated that, if she wanted to commence production,

it would take a week to produce merchandise.[52]   Although MEC vigorously disputes the

authenticity of these "oral licenses," at this stage of these proceedings the Court will not make a

finding of the authenticity or value of the purported licenses.

Despite MEC's contentions, the Court finds that, based upon the entire record, the Debtor

did not file this bankruptcy case in bad faith or for an improper purpose.   The Motion to Dismiss

is denied without prejudice.   In addition, for these same reasons, MEC's request for conversion or

the appointment of a chapter 11 trustee is also denied without prejudice based on this record.

***MEC's Lift Stay Motion***

As an alternative to dismissal, MEC seeks relief from the automatic stay under section

362(d)(1) of the Bankruptcy Code so that it may pursue the District Court Action to final

judgment.   MEC contends that application of the factors identified by the Second Circuit in *In re*

*Sonnax Indus. Inc.* (the "*Sonnax* Factors") warrants relief from the stay.   *Sonnax Indus. Inc. v.*

*Tri Component Prods. Corp. (In re Sonnax Indus. Inc.)*, 907 F.2d 1280 (2d Cir. 1990).[53]

---

[50] Debtor's Objection to the Motion to Dismiss at ¶ 17

[51] 3/7/13 Tr. at 17:2-18:24

[52] 3/7/13 Tr. at 21:20-24

[53] MEC also seeks stay relief for cause based upon the Debtor's alleged bad faith filing.   Having determined that this case was not filed in bad faith, the Court need not reach that portion of the Lift Stay Motion.   *See In re 221-06 Merrick Blvd. Assoc's LLC*, 2010 WL 5018265 at *4 (Bankr. E.D.N.Y. Dec. 3, 2010) ("[T]he factors for the Court to consider when determining bad faith as cause to terminate the automatic stay under Section 362(d)(1) are the same as the factors used by the Court to determine cause for dismissal of a case under Section 1112(b).") (citing *In re AMC Realty Corp.*, 270 B.R. 132, 141 (Bankr. S.D.N.Y. 2001)).

In the Debtor's Objection to the Lift Stay Motion, submitted prior to the Evidentiary Hearing,[54] the Debtor contends that application of the *Sonnax* Factors weighs against stay relief. Essentially, Debtor argues that continuation of the District Court Action "will distract [Baksht and the Debtor] from tasks attendant to the Debtor's business and administering to the Debtor's reorganization."[55]

Section 362(d)(1) authorizes the Court to lift the automatic stay "for cause, including lack of adequate protection of an interest in property of such party in interest."   11 U.S.C. § 362(d)(1). The Bankruptcy Code does not define "cause," rather, courts analyze cause on a case-by-case basis.   The Second Circuit adopted twelve factors for courts to consider when determining the existence of cause for stay relief in order to permit the continuation of prepetition litigation in another forum.[56]

The *Sonnax* Factors are:

> (1) whether relief would result in a partial or complete resolution of the issues;
> (2) lack of any connection with or interference with the bankruptcy case;
> (3) whether the other proceeding involves the debtor as a fiduciary;
> (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;
> (5) whether the debtor's insurer has assumed full responsibility for defending it;
> (6) whether the action primarily involves third parties;
> (7) whether litigation in another forum would prejudice the interests of other creditors;
> (8) whether the judgment claim arising from the other action is subject to equitable subordination;
> (9) whether movant's success in the other proceeding would result in a judicial lien

---

[54] The Debtor does not address the *Sonnax* Factors in Debtor's Post Hearing Memo.

[55] Debtor's Objection to Lift Stay Motion at ¶ 9

[56] The legislative history to section 362(d)(1) emphasizes the section's applicability to proceedings in another forum: "It will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result in order to leave the parties to their chosen forum and to relieve the bankruptcy court from duties that may be handled elsewhere."   H.R.Rep. No. 595, 95th Cong., 1st Sess., 341 (1977), U.S. Code & Admin. News 1978, pp. 5787, 5297.

avoidable by the debtor;
(10) the interests of judicial economy and the expeditious and economical resolution of litigation;
(11) whether the parties are ready for trial in the other proceeding; and
(12) impact of the stay on the parties and the balance of harms.

*In re Sonnax Indus*., 907 F.2d at 1286.

"The burden of proof on a motion to lift or modify the automatic stay is a shifting one" and rests initially on the moving party to make a showing of "cause" for relief.   *Id.* at 1285; *Mazzeo v. Lenhart (In re Mazzeo)*, 167 F.3d 139, 142 (2d Cir. 1999).   In the event "the movant fails to make an initial showing of cause ... the court should deny relief without requiring a showing from the debtor that it is entitled to continued protection."   *In re Sonnax Indus.*, 907 F.2d at 1285.

Ultimately, whether to grant relief from the automatic stay is a matter left to the Court's discretion.   *Id.*   Accordingly, "the court need not give equal weight to each factor."   *In re Taub*, 438 B.R. 39, 45 (Bankr. E.D.N.Y. 2010) (citing *Lamarche v. Miles*, 416 B.R. 53, 58 (Bankr. E.D.N.Y. 2009)).   Additionally, "[n]ot all of these factors will be relevant in every case."   *In re Mazzeo*, 167 F.3d at 143 (2d Cir. 1999).   Thus, in deciding whether to grant stay relief to permit a creditor to continue litigation in another forum, the court should consider the "particular circumstances of the case, and ascertain what is just to the claimants, the debtor and the estate." *In re Touloumis*, 170 B.R. 825, 828 (Bankr. S.D.N.Y. 1994).

### *Application of the Sonnax Factors*

Here, the relevant *Sonnax* Factors are as follows:

*Sonnax Factor 1: Whether Relief Would Result in a Partial or Complete Resolution of the Issues*

The continuation of the District Court Action will completely resolve the uncertainty of what interest, if any, the Debtor has in the "3DL" trademark and will also fix MEC's claim, if any, against the Debtor.   Even Mr. Friedlander, the Debtor's proposed corporate attorney, agreed that

the dispute must be resolved and testified that the Debtor's business can be rehabilitated provided the Debtor wins the litigation.[57]    Accordingly, this factor weighs in favor of relief from the automatic stay.

*Sonnax Factor 2: Lack of Any Connection or Interference with the Bankruptcy Case*

While Baksht testified that continuation of the District Court Action would distract him from operating the Debtor's business, resolution of the District Court Action will bring finality to the Debtor's claim that it has a cognizable interest in the "3DL" trademark and will fix the claims of both the Debtor and MEC.    Mr. Friedlander testified that the Debtor's business was "inchoate, it's not tangible. . . . It's there, but it needs further development." [58]    And, as noted above, Mr. Friedlander agreed that the Debtor's ability to rehabilitate its business is dependent upon the Debtor winning the litigation.[59]    While it is clear that Baksht is a central party to both the bankruptcy case and the District Court Action, the resolution of the trademark claims is critical to the progress of the bankruptcy case.    Accordingly, the Court finds that stay relief will not interfere with the bankruptcy case.    Rather, the continuation of the District Court Action will determine the viability of the Debtor's business and, consequently, the success of its bankruptcy case.

*Sonnax Factor 7: Whether Litigation in Another Forum Would Prejudice the Interests of Other Creditors*

Resolution of the District Court Action will not prejudice the interest of the Debtor's other creditors because stay relief will be limited to the entry of a final judgment and will not extend to the enforcement of a judgment.    Thus, this factor favors stay relief.

---

[57] 3/4/13 Tr. at 311:16-23
[58] 3/4/13 Tr. at 308:17-19
[59] 3/4/13 Tr. at 311:20-23

*Sonnax Factor 10: The Interest of Judicial Economy and the Expeditious and Economical Resolution of Litigation*

The District Court is the most appropriate and efficient forum to determine the claims in the District Court Action because: (i) the claims in that action concern, among other things, the application and interpretation of federal and state intellectual property law, not bankruptcy law; (ii) the Florida District Court Judge is already well-versed with the facts, issues and parties in that action after two years of litigation; (iii) discovery has been completed in the District Court Action; (iv) most of the underlying events occurred in Florida; and (v) most of the non-party witnesses reside in Florida.   Additionally, the Florida District Court, unlike this Court, is prepared to conduct a jury trial.   Thus, the Court finds that this factor supports stay relief.

*Sonnax Factor 11: Whether the Parties Are Ready for Trial in the Other Proceeding*

The District Court Action has been pending for two years and was trial-ready prior to the Debtor's bankruptcy filing.   The parties completed discovery, including the depositions of eleven witnesses and the production of tens of thousands of pages of documents.   The District Court decided motions for summary judgment by both MEC and the Debtor.   Moreover, the parties have filed a seventy-page Joint Pretrial Statement and a jury trial was scheduled for February 2013.   This factor weighs heavily in favor of stay relief.

*Sonnax Factor 12: Impact of the Stay on the Parties and the Balance of Harms*

Although Baksht claims that continuation of the District Court Action would interfere with the Debtor's efforts to reorganize, it does not appear that the Debtor can reorganize if it is not successful before the District Court.   Refusing to allow the District Court Action to proceed would prejudice MEC by forcing it to incur substantial additional legal fees and expenses, as well as burden the many non-party witnesses who reside in Florida and, absent stay relief, would need

22

to appear in a distant forum.

Despite his opposition to the Lift Stay Motion, Baksht nevertheless concedes that the trademark issues must be resolved[60] and he has taken action to that end. Baksht testified that the Debtor retained litigation counsel for the District Court Action[61] and estimates that about $200,000 would be needed to appropriately fund the litigation.[62] Meanwhile, Schwarz testified that she is prepared to provide financing to the Debtor of up to $200,000 to be used "mostly for litigation," including the District Court Action.[63] Thus, the testimony reflects that the Debtor now has the financial wherewithal to fund the District Court Action and seek to reinstate what it claims to be a very valuable counterclaim. Indeed, the Debtor indicates that the "counterclaim was dismissed without prejudice due to technical corporate formalities having to do with counsel which can easily be remedied by the Debtor."[64] There is no question that the resolution of the District Court Action will aid the administration of the Debtor's bankruptcy case. Accordingly, this factor favors stay relief.

After considering the relevant *Sonnax* Factors and the record in this case, the Court concludes that MEC has met its burden and has shown cause to lift the automatic stay in order for the District Court Action to proceed. The Debtor has failed to carry the necessary burden to warrant continuation of the automatic stay. Accordingly, for the reasons set forth herein, MEC's Lift Stay Motion is granted. MEC may proceed with the District Court Action to conclusion and entry of judgment. This Court shall retain jurisdiction to enforce any judgment within the context

---

[60] 2/27/13 Tr. at 86:19-24, 87:21-24
[61] 2/28/13 Tr. at 101:16-103:8
[62] 3/1/13 Tr. at 145:13-16
[63] 3/7/13 Tr. at 66:7-14
[64] Debtor's Objection to Motion to Dismiss at ¶ 8

of this bankruptcy case.

## Conclusion

For the reasons set forth above, MEC's Motion to Dismiss is denied without prejudice and MEC's Lift Stay Motion is granted.   A separate order in conformity with this Memorandum Decision shall be issued forthwith, which shall provide, with respect to the Lift Stay Motion, that notwithstanding the provisions of Bankruptcy Rule 4001(a)(3), the order shall become effective thirty days after its entry.[65]

––––––––––––––––––––

[65] On July 18, 2013, the Court held a hearing on the United States Trustee's Motion to Dismiss or in the Alternative, Motion to Convert to Chapter 7, filed on May 31, 2013.   Docket Entry 60.   The Court granted the United States Trustee's Motion to Convert to Chapter 7 on the independent grounds set out in that motion.   The thirty day stay will allow the newly appointed Chapter 7 Trustee time to evaluate the estate's interest in the trademark litigation.



**Dated: July 23, 2013**
**Brooklyn, New York**

**Nancy Hershey Lord**
**United States Bankruptcy Judge**